IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.                                                              Criminal No. ELH-16-0159

WILLIAM CORNISH,

Petitioner.

**MEMORANDUM OPINION**

William Cornish, defendant, entered a plea of guilty on August 3, 2016, to the offense of conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 846.  *See* ECF 51; *see also* ECF 52 ("Plea Agreement").  This was Cornish's fourth federal conviction.  *See* ECF 56 (Presentence Report or "PSR"), ¶¶ 32, 34–35.  Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the Court sentenced defendant on October 18, 2016 (ECF 66), to a term of 168 months of incarceration, with credit for time served dating from April 8, 2016.  ECF 67 ("Judgment").  Cornish's sentence was 47 months longer than the top end of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range.  *See* ECF 56, ¶ 63.

Through counsel, Cornish has filed a "Motion for Sentence Reduction Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i)."  ECF 204 ("Motion").  The Motion is supported by numerous exhibits.  ECF 204-2–204-35.[1]  He seeks a reduction of his sentence to a term of imprisonment within the Guidelines, *i.e.*, 120 to 121 months.  ECF 204 at 2.  The government opposes the Motion, supported by a single exhibit of 89 pages.  ECF 209 ("Opposition"); ECF 209-1.  Cornish replied.  ECF 212

---

[1] No exhibit numbered ECF 204-33 appears to have been filed.

("Reply"). He also filed a letter updating the Court on his health and his participation in prison education programs. ECF 215 ("Letter"). The letter includes two exhibits. ECF 215-1, 215-2.

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I shall grant the Motion, in part. In particular, I shall reduce defendant's sentence to 130 months of incarceration.

## I. Background

On April 19, 2016, Cornish and three co-conspirators were indicted on charges of conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 846. ECF 26 ("Indictment"). As noted, Cornish pleaded guilty on August 3, 2016. *See* ECF 52. In the Plea Agreement, the parties stipulated to the following facts, *id.* at 4–6, ¶ 6(a) (bold in original):

> In and about April of 2016, in the District of Maryland, **WILLIAM FREDERICK CORNISH** did combine[,] conspire, confederate and agree with individuals he later learned to be **HECTOR M. HERNANDEZ-VILLAPANDO, ENIXAE HERNANDEZ-BARBA, and HECTOR L. HERNANDEZ-BARBA**, and with other persons to knowingly and intentionally possess and possess with the intent to distribute five kilograms (5000 grams) or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. Sections 846 and 841.
>
> Specifically, the Government would prove that on April 6, 2016, a warehouse located at 717 Hammonds Ferry Road. Linthicum Heights, MD was under surveillance by investigators. A tractor trailer with the "KMKJ" logo was observed and it arrived at the rear bay door of Unit L of 717 Hammonds Ferry Road. Investigators observed the movement of objects from the trailer into the warehouse, and it appeared as if items were being removed from the tractor trailer and placed in the warehouse. At approximately 11:23 am, a white 2004 Ford Van, previously observed by investigators being utilized by those later identified by investigators as **Hector M. HERNANDEZ-VILLAPANDO, Enixae HERNANDEZ-BARBA, and Hector L. HERNANDEZ-BARBA**, arrived at the warehouse. The van was observed traveling around the parking lot and warehouse building and the two occupants appeared to the agents to be conducting counter-surveillance of the area. The two Hispanic males, later identified as **Enixae HERNANDEZ-BARBA and Hector L. HERNANDEZ-BARBA**, got out of the Ford Van and entered Unit L through the front door of the warehouse. Both **Enixae HERNANDEZ-BARBA**

and **Hector L. HERNANDEZ-BARBA** left Unit L empty-handed, and re-entered the white Ford Van. The van then travelled back to 106 John Avenue, Linthicum Heights, MD, which investigators believe to be the residence of **Enixae HERNANDEZ-BARBA**.

On April 8, 2016, a black colored Honda with Maryland tag 68805CF, arrived at the warehouse and dropped off a Hispanic male wearing a red sweatshirt, later identified by investigators as **Hector L. HERNANDEZ-BARBA**. **Hector L. HERNANDEZ-BARBA** entered Unit L utilizing the rear door of the warehouse. The black Honda was then observed leaving the parking lot. The black Honda returned to the warehouse with additional two Hispanic males. The Hispanic males were later identified as **Hector M. HERNANDEZ-VILLAPANDO** and **Enixae HERNANDEZ-BARBA**. **Hector M. HERNANDEZ-VILLAPANDO** and **Enixae HERNANDEZ-BARBA** entered Unit L through the rear door of the business. Soon after, **Enixae HERNANDEZ-BARBA** was observed by investigators leaving the warehouse and entered the black Honda. The vehicle was observed leaving the parking lot. Investigators observed the black Honda driving around the parking lot and surrounding area of the warehouse and he appeared to investigators to be conducting counter-surveillance to determine if law enforcement officers were in the area.

Investigators then observed a silver-colored Ford F-150, with Maryland tag 6CG4330, leave the lot and it followed the black Honda east-bound on Nursery Road. The vehicles were observed bv investigators next to each other on Ravnor Avenue, just east of the warehouse. The occupants of the vehicles (the black Honda and the silver F-150) appeared to be engaged in conversation while in the middle of the roadway. Both vehicles then traveled back to the warehouse. The black Honda parked in the lot and investigators observed **Enixae HERNANDEZ-BARBA** get out of the vehicle and enter the warehouse. Investigators observed the Ford F-150 traveled to the parking lot in the front of 717 Hammonds Ferry Road and stopped in front of the main bay door of Unit L. The bay door to Unit L was raised and the Ford F-150 drove into the warehouse and the loading bay door was closed. A short time later, the bay door re-opened and the Ford F-150 was observed by investigators driving out of the warehouse.

Investigators made contact with the Ford F-150 as it left the warehouse area and stopped the vehicle. At that time, the driver, **William Frederick CORNISH,** was asked to get out of the vehicle and was detained by investigators. Investigators then observed and identified **Hector M. HERNANDEZ-VILLAPANDO, Hector L. HERNANDEZ-BARBA,** and **Enixae HERNANDEZ-BARBA** leaving Unit L through the front door. At that time. investigators made contact with these individuals and they were also detained. **Enixae HERNANDEZ-BARBA** was found to be in possession of a set of keys to Unit L of the warehouse.

Within minutes of stopping **CORNISH,** a drug detection dog was utilized to scan the exterior of the Ford F-150 for the presence of illegal narcotics. The

Maryland State Police handler and her dog "Akita", a certified drug detection dog, conducted the scan. The narcotics detection dog, "Akita," is trained to alert to the odor of controlled substances. These substances include: marijuana. cocaine. methamphetamine. heroin, and MDMA. Narcotics detection dog "Akita" maintains up-to-date certifications. The scan by "Akita" resulted in a positive response by the dog on the F-150 for the presence of illegal drugs. Investigators then entered the Ford F-150 and found a large cardboard box in the back seat of the truck. The cardboard box contained 31 brick shaped packages of suspected narcotics. Three of the brick-shaped packages were field-tested using approved technologies, and packages tested positive for the presence of cocaine. The 31 kilograms of cocaine have a wholesale value in Baltimore of approximately $1,000,000 dollars.

The driver of the vehicle, William Frederick **CORNISH.** was identified through his Maryland Driver's License. The address on the license revealed that **CORNISH** resided at 3039 Cascade Drive, Abingdon, Maryland 21009. Located inside the truck were documents with William Cornish's name and address, 3039 Cascade Drive, Abingdon, Maryland 21009.

In the subsequent search of 106 John Avenue, investigators found three large duffel bags in the basement containing large amounts of US Currency. The money was vacuum sealed in numerous plastic bags and marked with monetary amounts on the outside of each plastic bag. Investigators believe that the duffel bags contain approximately $2.4 million dollars based on the totals written on each vacuum sealed pouch. Additionally, investigators located a drug/money ledger inside of 106 John Avenue, documenting just over $2.4 million dollars in receipts from the sale of illegal drugs. Documents were located in the residence bearing the names of **Hector M. HERNANDEZ** and **Enixae HERNANDEZ-BARBA**.

Further, the parties agreed that, under the Guidelines, "a base offense level of 32 applies to the conduct of [defendant]. . . ." *Id.* And, pursuant to U.S.S.G. § 3E1.1, the parties agreed to a three-level reduction in the base offense level. *Id.* at 6, ¶ 6(b). Therefore, Cornish's "net offense level [was] 29." *Id.*

Paragraph 6(c) of the Plea Agreement is also pertinent. *Id.* at 6. There, pursuant to Fed. R. Crim. P. 11(c)(1)(C), the parties agreed to "a total sentence of fourteen years (168 months) imprisonment" as the appropriate disposition.

The PSR reflected that Cornish had previously been convicted of four felony offenses, of which three were federal crimes. ECF 56, ¶¶ 32, 34–35. In particular, in November of 1981, at

4

the age of 18, defendant was arrested for armed robbery of a federal credit union. *Id.* ¶ 32. He pleaded guilty in federal court in Baltimore on March 2, 1982, and was sentenced to 12 years of incarceration. *Id.* However, he was released on parole on June 21, 1984, because he was a youthful offender. *Id.* On December 7, 1987, Cornish pleaded guilty in the Circuit Court for Baltimore County to a felony drug offense. *Id.* ¶ 33. He was sentenced on January 11, 1988, to four years of incarceration. *Id.* On July 25, 1988, Cornish pleaded guilty in federal court in Baltimore to conspiracy to distribute and possess with intent to distribute cocaine. *Id.* ¶ 34. He was sentenced to seven years' imprisonment, to run consecutive to the state sentence he was then serving. *Id.* Defendant was paroled from state custody into federal custody on August 24, 1989, and then paroled from federal custody on January 8, 1993. *Id.* On November 29, 1994, Cornish pleaded guilty in federal court to conspiracy to distribute and possess with intent to distribute cocaine. *Id.* ¶ 35. He was sentenced on February 21, 1995, to 180 months of incarceration, to be followed by five years of supervised release. *Id.* His supervised release began on January 21, 2008, and terminated on June 20, 2011. *Id.* And, in 2016, Cornish received probation before judgment for traveling 83 miles per hour ("MPH") in a 55 MPH zone. *Id.* ¶ 36.

Although Cornish had three prior federal convictions, only one prior conviction resulted in criminal history points: the 1994 conviction for conspiracy to distribute and possess with intent to distribute cocaine. *Id.* ¶ 35 (referencing case JFM-94-0215). For that offense, Cornish received three criminal history points. *Id.* As a result, despite a serious prior record, defendant had a criminal history category of II. *Id.* ¶ 37.

The PSR determined that, with an offense level of 29 and a criminal history category of II, the Guidelines ordinarily would have called for a sentence ranging from 97 to 121 months of incarceration. *Id.* ¶ 63. However, because Cornish's offense carried a ten-year mandatory

minimum, the effective Guidelines range was 120 to 121 months of imprisonment, pursuant to U.S.S.G. § 5G1.1(c)(2). *Id.* Nonetheless, the PSR stated that the sentence agreed to in the Plea Agreement—168 months' imprisonment—was "appropriate for punishment." *Id.* at 17. The PSR explained, *id.*:

> William Cornish is . . . a 52 year old man convicted of his fourth federal felony. Since June of 1982, he has been incarcerated for a total of 21 years, many of them in federal custody, and most of the remainder of that time was spent under community supervision. Although the defendant has maintained his own business which appears to be successful, he continues to turn to illegal activity to supplement his income. Additionally, Mr. Cornish appears to be an individual who is not deterred by lengthy periods of incarceration.

Sentencing was held on October 18, 2016. ECF 66. At the time, the defendant was 52 years of age. ECF 56 at 3. I imposed the agreed upon sentence of 168 months of imprisonment. ECF 67.

Cornish filed a pro se motion for compassionate release on June 14, 2020. ECF 197 ("First Motion"). He sought relief on the basis of his "history of Asthma, Hypohidrosis, and Pneumonia," claiming that these conditions placed him at special risk of severe infection from COVID-19. *Id.* at 4. He also stated that although he "began experiencing severe chest pains" after contracting COVID-19, the results of an electrocardiogram, or EKG, and an x-ray were normal. *Id.* 4–5.

By Order entered July 14, 2020, the Court denied the First Motion. ECF 201. The Court explained that, "[d]espite Mr. Cornish's medical history, which includes asthma, 'hypohidrosis,' and various neck and back issues, [he] did not experience any severe complications" when he was infected with COVID-19, and "has since fully recovered from his illness." *Id.* at 4. Moreover, the Court noted that "a modification of [Cornish's] sentenced would be contrary to [18 U.S.C.] § 3553(a)," because, "[a]mong other considerations, he faced a mandatory minimum sentence of 10 years and has served only a fraction of his sentence." *Id.*

Cornish has since received two doses of the Moderna vaccine. He received the first dose on August 31, 2021, and the second dose on October 2, 2021. ECF 209-1 at 65.

On December 1, 2021, Cornish, through appointed counsel, filed the instant Motion. He seeks a reduction of his above-Guidelines sentence to one within the Guidelines, on the grounds that his sentence is disproportionately severe in comparison to the sentences received by his codefendants, and his borderline obesity leaves him especially vulnerable to severe infection from COVID-19. ECF 204 at 1–2.

Cornish is now incarcerated at the Federal Correctional Institution in Cumberland ("FCI Cumberland"). ECF 217. He has served about 90 months, or 54 percent of his sentence, dating from April 8, 2016. *See* ECF 67 at 2. Cornish has a projected release date from the Bureau of Prisons ("BOP") of March 13, 2027. *See Find an inmate*, Federal Bureau of Prisons, https://www.bop.gov/inmateloc/ (last accessed Oct. 19, 2023).

## II.  Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Brown*, 78 F.4th 122, 128 (4th Cir. 2023); *United States v. Malone*, 57 F.4th 167, 173 (4th Cir. 2023); *United States v. Bond*, 56 F. 4th 381, 383 (4th Cir. 2023); *United States v. Bethea*, 54 F.4th 826, 831 (4th Cir. 2022); *United States v. Ferguson,* 55 F.4th 262, 267 (4th Cir. 2022); *United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022); *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019). But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011). One such exception is when the modification is "expressly permitted by statute." *See* 18 U.S.C. § 3582(c)(1)(B); *see also Jackson*, 952 F.3d at 495.

With the passage of the First Step Act ("FSA") in 2018, Congress "broadened" the authority of courts to grant sentencing modifications. *Malone*, 57 F.4th at 173; *see* Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018) (codified as 18 U.S.C. § 3582(c)(1)(A)). Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) authorizes courts to modify a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction." *Hargrove*, 30 F.4th at 194. This provision is an exception to the ordinary rule of finality in regard to a federal sentence. *United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021).

Section 3582 was first enacted as part of the Sentencing Reform Act of 1984. As originally enacted, it permitted a court to alter a sentence only upon motion by the Director of the BOP. *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). This meant that a defendant seeking compassionate release had to rely on the BOP Director for relief. *See Bethea*, 54 F.4th at 831; *see, e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866–67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

For many years, compassionate release was exceedingly rare, because the BOP rarely filed motions on an inmate's behalf. *See Hr'g on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013). Now, however, after the enactment of the FSA in December 2018, a federal inmate may file a motion for compassionate release directly with the court after exhausting administrative remedies. *See United States v. McCoy*, 981 F.3d 271, 275–76 (4th Cir. 2020).

In particular, pursuant to the 2018 FSA, the Court may reduce a defendant's term of

imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. 18 U.S.C. § 3582(c)(1)(A) (emphasis added). That is, once a defendant has exhausted his administrative remedies, or after 30 days have passed from the date on which the warden has received the defendant's request, the defendant may petition a court directly for compassionate release. *Ferguson*, 55 F.4th at 268; *Jenkins*, 22 F.4th at 169; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276. This constituted a sea change in the law.

Nonetheless, there are restrictions. Under 18 U.S.C. § 3582(c)(1)(A), the court may modify the defendant's sentence only if two criteria are met. *Brown*, 78 F.4th at 128; *Bethea*, 54 F.4th at 831; *Bond*, 56 F.4th at 383.

"First, the court must determine the prisoner is eligible for a sentence reduction because he has shown 'extraordinary and compelling reasons' supporting relief." *Bethea*, 54 F.4th at 831 (citation omitted); *see also Bond*, 56 F.4th at 383; *United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam), *cert. denied*, ___ U.S. ___, 142 S. Ct. 383 (2021). If that criterion is met, the court "must then find that release is appropriate under the 18 U.S.C. § 3553(a) sentencing factors, to the extent those factors are applicable." *Bethea*, 54 F.4th at 831; *see also Malone*, 57 F.4th at 174; *Hargrove*, 30 F.4th at 194; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021); *Kibble*, 992 F.3d at 330.

Generally, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis." *Jenkins*, 22 F.4th at 169. But, the Fourth Circuit has said: "When deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only

if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)).

In U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might merit compassionate release. *See McCoy,* 981 F.3d at 276–77.[2] In particular, U.S.S.G. § 1B1.13 provides that on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

However, as the Fourth Circuit has recognized, there is no applicable policy statement for a motion filed by a defendant under § 3582(c)(1)(A). *See*, *e.g.*, *Malone*, 57 F.4th at 174; *McCoy*, 981 F.3d at 276. Notably, the policy statement in U.S.S.G. § 1B1.13 was issued in 2006 and was last updated in November 2018, *before* the enactment of the FSA. On its terms, the statement is "directed at BOP requests for sentence reductions." *McCoy*, 981 F.3d at 276 (citing U.S.S.G. § 1B1.13). Thus, "[b]y its plain terms. . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." *McCoy*, 981 F.3d at 282; *see also Jenkins*, 22 F.4th at 169; *United States v. Brooker,* 976 F.3d 228, 235–36 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1100–02 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020).[3]

---

[2] The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"), as well as 28 U.S.C. § 994(a)(2)(C). *See McCoy,* 981 F.3d at 276.

[3] This will soon change. An amended policy statement, expressly made applicable to defendant-filed motions for compassionate release, takes effect on November 1, 2023. *See*

"Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276.  In any event, because there is currently no Sentencing Commission policy statement applicable to a defendant's compassionate release motion, "district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to [U.S.S.G.] § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283; *see also Hargrove*, 30 F.4th at 194–95; *United States v. Brice*, 2022 WL 3715086, at *1 (4th Cir. Aug. 29, 2022) (per curiam).  Indeed, district courts are "'empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (citation omitted); *see also Jenkins*, 22 F.4th at 170.

"The factors applicable to the determination of what circumstances can constitute an extraordinary and compelling reason for release from prison are complex and not easily summarized." *Hargrove*, 30 F.4th at 197.  Although the Guidelines "are not directly applicable to defendant-filed motions" under § 3582(c), "the court may consider these guidelines in defining what should be considered an 'extraordinary and compelling circumstance' warranting a sentence reduction." *Jenkins*, 22 F.4th at 169 (citing U.S.S.G. § 1B1.13); *see High*, 997 F.3d at 187.  However, "[i]n deciding a motion for compassionate release, the district court is confined to the evidence presented." *Bethea*, 54 F.4th at 833 n.2; *see also United States v. Osman*, 2022 WL 485183, at *1 (4th Cir. Feb. 17, 2022).

Of relevance here, the Supreme Court decided *Concepcion v. United States*, 597 U.S. ___, 142 S. Ct. 2389 (2022), on June 27, 2022.  In that case, the Supreme Court said, in the context of

---

*Sentencing Guidelines for United States Courts*, 88 Fed. Reg. 28254 (May 3, 2023) (proposed U.S.S.G. § 1B1.12(b)(1)(A)–(C)).  In my view, even if the amended policy statement were already in effect, I would reach the same result.

§ 404(b) of the First Step Act, that "a district court cannot . . . recalculate a movant's benchmark Guidelines range in any way other than to reflect the retroactive application of the Fair Sentencing Act [of 2010] . . . ." *Id.* at 2402 n.6.  The Court explained that the "Guidelines range 'anchor[s]' the sentencing proceeding . . . .  The district court may then consider postsentencing conduct or nonretroactive changes . . . with the properly calculated Guidelines range as the benchmark." *Id.* (first alteration in original; internal citation omitted); *see also United States v. Troy*, 64 F.4th 177, 183–84 (4th Cir. 2023).

To be sure, the district court is obligated to consider all non-frivolous arguments for sentence reduction based on intervening changes in the law and factual developments. *Concepcion*, 142 S. Ct. at 2396; *Troy*, 64 F.4th at 184; *United States v. Reed*, 58 F.4th 816, 822 (4th Cir. 2023); *Brice*, 2022 WL 3715086, at *2.  Where appropriate, the district court "must account not only for the circumstances at the time of the original offense but also for significant post-sentencing developments." *United States v. Mangarella*, 57 F.4th 197, 203 (4th Cir. 2023); *see Martin*, 916 F.3d at 397; *Kibble*, 992 F.3d at 334 n.3.  However, such developments do not warrant a recalculation of the Guidelines. *Troy*, 64 F.4th at 184.

Among other things, "successful rehabilitation efforts can be considered" as part of the court's analysis of extraordinary and compelling reasons. *United States v. Harris*, 2022 WL 636627, at *1 (4th Cir. Mar. 4, 2022) (per curiam); *see United States v. Gutierrez*, 2023 WL 245001, at *4 (4th Cir. Jan. 18, 2023) (stating that, in considering a compassionate release motion, the district court erred by failing to address the defendant's evidence of rehabilitation). Nevertheless, "rehabilitation alone cannot serve as a basis for compassionate release." *United States v. Davis*, 2022 WL 127900, at *1 (4th Cir. Jan. 13, 2022) (per curiam); *see McCoy*, 981 F.3d at 286 n.9; *Harris*, 2022 WL 636627, at *1; 28 U.S.C. § 994(t).  In addition, a sentence

disproportionately long in relation to sentences received by other similarly situated defendants, or in relation to the sentence that the defendant would receive under currently applicable law, can constitute a basis for a sentence reduction.  *Brown*, 78 F.4th at 131–34; *McCoy*, 981 F.3d at 285–86.

The defendant, as the movant, bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582.  *See, e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, 451 F. Supp. 3d 562, 565 (W.D. Va. 2020). Moreover, compassionate release is a "rare" remedy.  *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019); *see United States v. Chambliss*, 948 F.3d 691, 693–94 (5th Cir. 2020); *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2–3 (W.D. N.C. Mar. 16, 2020).

As explained, even if the defendant establishes an extraordinary and compelling reason that renders him eligible for a sentence reduction, the court's inquiry is not over.  The court must then consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate.  *See Dillon v. United States*, 560 U.S. 817, 826–27 (2010); *Brown*, 78 F.4th at 128; *Mangarella*, 57 F.4th at 200, 203; *Malone*, 57 F.4th at 174; *Bethea*, 54 F.4th at 833; *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *Martin*, 916 F.3d at 397; *see also United States v. Jones*, 2022 WL 2303960, at *1 (4th Cir. June 27, 2022) (per curiam) (noting that "a court need not explicitly make findings on extraordinary and compelling reasons where consideration of the § 3553(a) factors counsels against release"); *United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion); *Kibble*, 992 F.3d at 329–30 (noting that district court must

consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d at 693–94 (district court must give due consideration to the § 3553(a) factors).

As the Fourth Circuit has observed, "'many case-specific facts fit under the broad umbrella of the Section 3553(a) factors.'" *Bond*, 56 F.4th at 384 (quoting *Jackson*, 952 at 500). Notably, in weighing the § 3553(a) factors, the court may consider the terms of a plea bargain. *Bond*, 56 F.4th at 384–85.

"A district court need not provide an exhaustive explanation analyzing every § 3553(a) factor," nor is it "required to address each of a defendant's arguments when it considers a motion for compassionate release." *Jenkins*, 22 F.4th at 170; *see Chavez-Mena v. United States*, ___ U.S. ___, 138 S. Ct. 1959 (2018); *High*, 997 F.3d at 187. But, "'the record as a whole'" must demonstrate that the judge considered the parties' contentions and had "'a reasoned basis'" for the exercise of judicial discretion. *Malone*, 57 F.4th at 176 (citations omitted); *see also United States v. Puzey*, 2023 WL 2985127, at *2 (4th Cir. Apr. 18, 2023) (per curiam). And, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law." *High*, 997 F.3d at 187 (internal quotation marks omitted); *see Jenkins*, 22 F.4th at 167; *see also Brown*, 78 F.4th at 132 (criticizing district judge's "cursory" consideration of the § 3553(a) factors).

That said, "[h]ow much explanation is 'enough' depends on the complexity of a given case." *Gutierrez*, 2023 WL 245001, at *3; *see United States v. McDonald*, 986 F.3d 402, 412 (4th Cir. 2021). In any event, "the court must provide an explanation sufficient 'to allow for meaningful appellate review' in light of the particular circumstances of the case." *United States v. Cohen*, 2022 WL 2314300, at *1 (4th Cir. June 28, 2022) (per curiam) (quoting *High*, 997 F.3d at 190). And, "when a defendant 'present[s] a significant amount of post-sentencing mitigation evidence, . . . a more robust and detailed explanation [is] required.'" *Cohen*, 2022 WL 2314302, at *1 (quoting *High*, 997 F.3d at 190) (alterations in *Cohen*). In providing such an explanation, "a district court is permitted to add to its original, sentencing-phase consideration of the § 3553(a) factors when explaining its compassionate release ruling." *Bethea*, 54 F.4th at 834; *see Kibble*, 992 F.3d at 332.

Of pertinence here, "it weighs against an abuse of discretion—and is viewed as 'significant'—when the same judge who sentenced the defendant rules on the compassionate release motion." *Bethea*, 54 F.4th at 834; *see Gutierrez*, 2023 WL 245001, at *5; *Hargrove*, 30 F.4th at 200; *High*, 997 F.3d at 189. In addition, "the district court is less likely to have abused its discretion if it considered arguments in opposition to its ultimate decision." *Bethea*, 54 F.4th at 834; *see also High*, 997 F.3d at 189; *Kibble*, 992 F.3d at 332.

The FSA "does not constrain the Court to decide between immediate release or no reduction at all, and instead leaves the Court discretion in its evaluation of the appropriate sentence once it finds 'extraordinary and compelling reasons.'" *United States v. Braxton*, JKB-09-478, 2020 WL 4748536, at *5 (D. Md. Aug. 17, 2020). Indeed, the statutory text of the First Step Act allows courts to "reduce the term of imprisonment" upon a finding of "extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A).

Numerous district courts in both this Circuit and others have granted sentence reductions without immediate release. *See, e.g.*, *United States v. Johnson*, RDB-07-0153, 2020 WL 6063733, at *5 (D. Md. Oct. 14, 2020) (reducing sentence from 360 months to 300 months); *Braxton*, 2020 WL 4748536, at *5 (reducing sentence from 246 months to 168 months); *United States v. Marks*, 455 F. Supp. 3d 17, 37–38 (W.D.N.Y. 2020) (reducing sentence from 40 years to 20 years); *United States v. Arey*, Crim. No. 5:05-00029, 461 F.Supp.3d 343, 2020 WL 2464796 (W.D. Va. May 13, 2020) (reducing sentence but denying immediate release); *United States v. Day*, 474 F. Supp. 3d 790 (E.D. Va. 2020) (same); see *also United States v. Zullo*, 976 F.3d 228, 327 (2d Cir. 2020) ("It bears remembering that compassionate release is a misnomer. 18 U.S.C. § 3582(c)(1)(A) in fact speaks of sentence reductions. A district court could, for instance, reduce but not eliminate a defendant's prison sentence . . . .").

### III.  COVID-19[4]

### A.

The World Health Organization declared COVID-19 a global pandemic on March 11, 2020.  *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[5]  Two days later, on March 13, 2020, President Trump declared a national emergency concerning the COVID-19 pandemic.  *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19),* TRUMP WHITE HOUSE (Mar. 13, 2020), https://perma.cc/WF55-8M4P.  That declaration was extended on several occasions.  *See*, *e.g.*, 88 Fed. Reg. 9385 (Feb. 10, 2023).

---

[4] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201.

[5] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed Oct. 19, 2023).

COVID-19 spawned "a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020), *aff'd in part, dismissed in part*, 2022 WL 1449180 (4th Cir. May 9, 2022) (per curiam). People infected by the coronavirus sometimes experience only mild or moderate symptoms. But, particularly at the outset of the pandemic, the virus caused severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).

On May 11, 2022, the United States "reached more than 1 million COVID-19 deaths, according to a Reuters tally, crossing a once-unthinkable milestone about two years after the first cases upended everyday life." Trevor Hunnicutt & Jeff Mason, *Biden marks one million U.S. COVID deaths after losing political battles*, Reuters (May 12, 2022), https://www.reuters.com/world/us/biden-marks-1-million-americans-dead-covid-2022-05-12/. And, as of March 10, 2023—the last day on which Johns Hopkins University updated its COVID-19 data—more than 103.8 million Americans had been infected with COVID-19. *See COVID-19 Dashboard*, The Johns Hopkins Univ., https://bit.ly/2WD4XU9 (last accessed Oct. 16, 2023).

The judges of this Court "have written extensively about the pandemic." *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic. *Id.* Nonetheless, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918. *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration.").

For a significant period, life as we have known it came to a halt.  For quite some time, businesses and schools were closed or operated on a limited basis, in an effort to thwart the spread of the virus, which is highly contagious.  *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (August 11, 2022), https://bit.ly/2XoiDDh.  The judiciary, too, faced many operational challenges.  Indeed, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it."  *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020).

Of relevance here, the Centers for Disease Control and Prevention ("CDC") identified certain risk factors that may increase the chance of severe illness due to the coronavirus, and the CDC has repeatedly revised its guidance concerning medical conditions that pose a greater risk of severe illness due to COVID-19.  The CDC last updated this guidance in May 2023.  *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 11, 2023), https://bit.ly/38S4NfY.

According to the CDC, the factors that increase the risk of severe illness include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities such as Down syndrome; heart conditions such as heart failure, coronary artery disease, cardiomyopathies, and possibly hypertension; HIV; being immunocompromised; liver disease; having a BMI 25 or higher; physical inactivity; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis.  *People with Certain Medical Conditions*, *supra*, https://bit.ly/38S4NfY.

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See COVID-19 Risks and Information for Older Adults*, CTRS. FOR DISEASE CONTROL & PREVENTION (Feb. 22, 2023), https://perma.cc/VG23-TQMM. Furthermore, "[t]he risk of severe illness from COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*, https://bit.ly/38S4NfY.

As to the CDC's risk factors, in the context of a motion for compassionate release, the Fourth Circuit has said that "use of a bright-line rule that accepts only the CDC's highest risk conditions is too restrictive." *Hargrove*, 30 F.4th at 195. In other words, there is no bright-line rule predicated only on the CDC's identification of certain health conditions in the "highest risk category." *Id.* at 196. Nevertheless, the court may consider the CDC's guidelines. *Bethea*, 54 F.4th at 832; *United States v. Petway*, 2022 WL 168577, at *3 (4th Cir. Jan. 19, 2022) (per curiam). And, "the inquiry should consider whether the underlying condition places the inmate at an increased risk of severe illness from Covid-19." *Bethea*, 54 F.4th at 832.

**B.**

To limit the spread of COVID-19, the CDC urges the practice of "social distancing" and the use of masks. *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CENTERS FOR DISEASE CONTROL & PREVENTION (Jan. 26, 2023), https://bit.ly/3dPA8Ba (last accessed Oct. 19, 2023). However, social distancing is particularly difficult in the penal setting. *Seth*, 2020 WL 2571168, at *2. Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining

sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high."). Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others. Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020). And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe*,' WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to limit their spread. *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S.

493, 519–20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. As the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020), the BOP made "extensive and professional efforts to curtail the virus's spread."

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 posed to inmates and employees of the BOP. The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction. *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

On March 26, 2020, then Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19. *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020). And, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281. In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General. *See* Pub. L. No. 116-136, § 12003(b)(2). On April 3, 2020, then Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ." *Hallinan*, 2020 WL 3105094, at *9. That memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ." *Id.*

Two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum on May 8, 2020, to implement the Attorney General's directives on the increased use of home confinement.  The memorandum provided that the BOP should prioritize for review for home confinement eligibility those inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

## C.

Although there is no cure for the coronavirus, medical therapies have continued to improve, and vaccines have been generally available for quite some time, with a new one that has recently become available.  *See Stay Up to Date with COVID-19 Vaccines*, CENTERS FOR DISEASE CONTROL & PREVENTION (Sept. 15, 2023), https://perma.cc/ST6Y-NCV3.

On January 4, 2021, at about the time the first vaccines became available, the BOP published "COVID-19 Vaccine Guidance."  *See COVID-19 Vaccine Guidance*, FEDERAL BUREAU OF PRISONS CLINICAL GUIDANCE (Jan. 4, 2021), https://perma.cc/P4KL-PEZW.  This guidance provided that administration of the COVID-19 vaccines (Pfizer and Moderna) would "align with [recommendations of] the Centers for Disease Control and Prevention." *Id.* at 4.  Its plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6.  The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, *Federal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, FORBES (Dec. 21, 2020), https://perma.cc/2FF2-G6PX.

Much has changed since that time.  The BOP has administered 347,534 doses of the COVID-19 vaccine to inmates and staff, and booster shots are available to inmates in accordance with CDC guidance.  *See COVID-19: Coronavirus*, BUREAU OF PRISONS, https://perma.cc/3KRC-

8JNJ (last accessed Oct. 19, 2023).  And, as of May 11, 2023—the last day on which the CDC updated its vaccine tracker—approximately 69% of the total U.S. population had completed their primary vaccination series (i.e., one dose of a single-dose vaccine or two doses on different days), including 32% of people from ages 5 to 11, 61% of people from ages 12 to 17, 66% of people from ages 18 to 24, 72% of people from ages 25 to 49, 83% of people from ages 50 to 54, and 94% of people ages 65 and up.  *See COVID-19 Vaccinations in the United States*, CTRS. FOR DISEASE CONTROL, https://perma.cc/B2KG-M4E3 (final update May 11, 2023); *Trends in Demographic Characteristics of People Receiving COVID-19 Vaccinations in the United States*, CTRS. FOR DISEASE CONTROL, https://perma.cc/6W5Q-55DR (final update May 11, 2023).

**D.**

In an interview in September 2022 on the CBS television show "60 Minutes", President Biden declared the pandemic "over" in the United States.  Alexander Tin, *Biden says Covid-19 pandemic is "over" in U.S.*, CBS NEWS (Sept. 19, 2022).  He stated: "The pandemic is over.  We still have a problem with COVID.  We're still doing a lotta work on it . . . .  But the pandemic is over."  *Id*.  And, on April 10, 2023, President Biden signed into law House Joint Resolution 7, "which terminate[d] the national emergency related to the COVID-19 pandemic."  Pub. L. No. 118-3, 137 Stat. 6 (2023).

Nonetheless, at the time of writing, data suggests that COVID-19 remains prevalent.  *See COVID Data Tracker*, CNTRS. FOR DISEASE CONTROL & PREVENTION (October 7, 2023), https://perma.cc/6HG6-C949. However, there are currently only two "open cases" of COVID-19 at FCI Cumberland, where Cornish is one of about 900 inmates.  *See Inmate COVID-19 Data*, FEDERAL BUREAU OF PRISONS, https://perma.cc/J89G-9A2Q (last updated October 18, 2023).

## IV. Discussion

### A.

Cornish argues that compassionate release is warranted by two "extraordinary and compelling" circumstances. ECF 204 at 1–2. First, he asserts that his sentence is significantly longer than the sentences received by his allegedly more culpable co-conspirators, and longer than the sentence he would receive today. *Id.* at 9–12. Second, he argues that his borderline obesity leaves him especially vulnerable to severe COVID-19. *Id.* at 12–16. In view of these circumstances, Cornish requests that the Court "grant [him] a modest sentence reduction so that his punishment falls—at the very least—within the range ascribed [sic] by" the Guidelines, *id.* at 2, namely, 120 to 121 months' imprisonment. *See* ECF 56, ¶ 63.

With respect to his allegedly disparate sentence, Cornish contends that he "was a relatively minor player in a large-scale drug conspiracy." ECF 204 at 2. According to Cornish, "[h]is co-conspirators appear to have had a greater role in planning and effecting the extensive cross-country and international drug conspiracy." *Id.* at 9. In contrast, Cornish asserts that his conduct— "transporting drugs in his truck"— was not "as egregious as that of his codefendants." *Id.* at 10. Nonetheless, Cornish points out that his co-defendants received sentences of no more than 57 months of incarceration, despite having greater culpability and a base offense level equal to or greater than his own. *Id.* at 4–5. Cornish also observes that each has now been released from prison. *Id.* at 5.

Cornish asserts that his "sentencing disparity . . . is at least partially the result of the Court having sentencing discretion" over Cornish's codefendants, but not Cornish himself. *Id.* at 10. He maintains that he accepted a 168-month sentence because the government "threatened" to pursue a sentencing enhancement under 21 U.S.C. § 851 that would have required a mandatory minimum

sentence of at least 20 years with exposure to life in prison.  *Id.*   "In effect," Cornish asserts, "it was the [government] who chose Cornish's sentence, and not the Court."  *Id.*   Indeed, Cornish argues that, "[h]ad the Court had the opportunity to impose a sentence of its choice, it is likely it would have imposed a lesser sentence" of no more than 121 months, *i.e.*, the upper end of the applicable Guidelines sentencing range.  *Id.* at 11.  Moreover, Cornish asserts that, even if the Court were to have exceeded the Guidelines range, it would not have done so by 47 months, *i.e.*, almost four years.  *Id.* at 12.

Cornish also disputes that his prior convictions justify his fourteen-year sentence.  *Id.*  In this regard, he notes that the government declined to pursue a Guidelines adjustment under § 4A1.3 for underrepresentation of criminal history.  *Id.*[6]

Defendant's second asserted "extraordinary and compelling" circumstance is his borderline obesity.  *Id.* at 12–13.  Cornish, whose body mass index ("BMI") has been above 25, observes that the CDC considers a person with a BMI of over 25 more likely to become seriously ill from COVID-19.  *Id.*  Moreover, Cornish asserts: "Courts around the country, including this one, have noted that BMI over 25 is a compelling reason to grant compassionate release."  *Id.* at 13 (citing *United States v. Craig*, ELH-18-0450, 2021 WL 1541665, at *9 (D. Md. Apr. 20, 2021)).  Cornish also provides information about the spread of the virus at FCI Fort Dix, where he was housed at the time the Motion was filed.  ECF 204 at 14–16.

Cornish also advances multiple grounds to support his contention that the sentencing factors in 18 U.S.C. § 3553(a) favor a reduction in sentence.

---

[6] This argument is without merit.  Given the agreed upon sentence, such a motion was unnecessary.

First, defendant posits that, even after "a modest reduction" of his sentence from fourteen to ten years, his sentence would remain "facially severe," particularly for a non-violent offense, and therefore "sufficient to reflect the seriousness of the crime and promote respect for the law." *Id.* at 16. Second, apparently in an effort to establish that a reduced sentence would remain "just punishment for [his] offense," Cornish asserts that the conditions of his confinement during the pandemic have "'sufficiently increased the severity of [his] sentence'" by, for example, preventing him from seeing visitors or exercising, "'that the purposes of sentencing [would be] fully met even with the proposed reduction.'" *Id.* at 17 (quoting *United States v. Green*, TDC-10-761, 2020 WL 2992855, at *4 (D. Md. June 4, 2020)). Third, Cornish draws the Court's attention to his "history and characteristics" as they are reflected in the many character letters he submitted in support of his Motion. *Id.* at 17–20.  Cornish's supporters ask the Court to consider, among other things, defendant's age: he is about to turn 60 years old; his recognition that "he made a mistake"; his "tireless work ethic"; his position as "head prison orderly"; his "generosity and gentle demeanor"; his "commit[ment] to finding the good in the kids he worked with" as a mentor; his faith as a Muslim; his completion of 42 prison education programs; and his preparedness to join his brother, Leroy Cornish, in the landscaping business. *Id.* at 18–20.  Fourth, Cornish argues that a reduced sentence will not prevent him from receiving "needed educational or vocational training," 18 U.S.C. § 3553(a)(2)(D), because, having already completed 42 prison education courses, most of them vocational, he would receive little benefit from further training. *Id.* at 20.

In its Opposition, the government maintains that Cornish has not identified any "extraordinary and compelling" circumstances justifying a sentence reduction.  ECF 209 at 1–3.

The government argues, first, that the only "extraordinary and compelling reasons" justifying a sentence reduction are those enumerated in Application Note 1 to Section 1B1.13 of

the Guidelines: a terminal medical condition or one that "substantially diminishes the ability of the

defendant to provide self-care . . . and from which he or she is not expected to recover"; age; family

circumstances; or "other reasons" "[a]s determined by the Director of the Bureau of Prisons."  ECF

209 at 13–14; *see* U.S.S.G. § 1B1.13 App. Notes 1(A)–(D).  The government denies that Cornish

has identified any "extraordinary and compelling reasons" as they are defined in Application Note

1.  ECF 209 at 14–15.  But, as discussed, U.S.S.G. § 1B1.13 is not applicable.

Second, the government contends that, even if the Court is not limited to considering the

"extraordinary and compelling reasons" listed in Application Note 1, Cornish's allegedly disparate

sentence and his weight would not justify relief.  *Id.* at 15–20.  With respect to Cornish's asserted

obesity, the government admits that "Cornish does qualify under the new CDC Guidelines for

obesity," but maintains that his "medical issues are under control."[7]  *Id.* at 18.   And, according to

the government, "[c]ompassionate release relief is saved for those types of conditions that are truly

not able to be remediated and which impact the defendant's ability to provide self-care in

prison . . . ."  *Id.* (citing *United States v. Weidenhamer*, CR-16-01072-001-PHX-ROS, 2019 WL

6050264, at *5 (D. Ariz. Nov. 8, 2019)). In the government's view, Cornish's weight is not one

such condition.

Third, with respect to Cornish's alleged disparate sentence, the government contends that

"[t]here are multiple justifiable reasons for [the] disparity."  ECF 209 at 19.  For example, unlike

his coconspirators, Cornish has a significant criminal history.  *Id.*   And, according to the

government, Cornish's sentence is not disparate in relation to "the sentences received by

---

[7] The government does not specify which "CDC Guidelines" it refers to here.  However, as noted, the CDC currently advises that those with a BMI above 25 are "more likely to get very sick from COVID-19."  *See People with Certain Medical Conditions*, *supra*, https://bit.ly/38S4NfY.

Baltimore-based accomplices" to whom Cornish is more appropriately compared—Stanley Rodgers and Lindell Robinson. *Id.* at 19–20.

The government also argues that Cornish is not eligible for a sentence reduction because he remains a danger to the community under the factors set forth at 18 U.S.C. § 3142(g), which, according to the government, the Court must consider pursuant to Section 1B1.13(2) of the Guidelines. *Id.* at 21.  The government asserts that Cornish "was part of a high-volume drug ring" that "took frequent deliveries of large quantities of heroin and cocaine from Sinaloa cartel groups operating in Baltimore." *Id.*   And, the government maintains that Cornish's "history and characteristics show that he is a continued danger," because his current prison term is his "fourth incarceration in federal prison." *Id.* at 22.  Indeed, Cornish "has spent roughly half his adult life in prison."  *Id.*  In sum, the government considers Cornish "a recidivist offender and habitual drug dealer" who "cannot be trusted to comply with applicable law."  *Id.* at 23.

 In addition, the government contends that the sentencing factors under 18 U.S.C. § 3553(a) weigh against reducing Cornish's sentence.  *Id.* at 3.  In particular, the government asserts that a sentence reduction is inappropriate because (1) Cornish's offense—taking delivery from the Sinaloa cartel of more than $1 million in cocaine—amply justifies a sentence of 168 months, *id.* at 24; (2) his history of recidivism "demonstrates that [he] . . . remains willing to engage in illegal conduct" even after long periods of incarceration, *id.* at 25; (3) a reduced sentence would fail to deter Cornish from future wrongdoing, *id.*; and (4) a lesser sentence would do nothing to promote respect for the law, *id.* at 26.

In his Reply, Cornish argues that the government "failed to rebut the argument that there is an unfair sentencing disparity between Cornish and his more culpable co-defendants," and reiterates that Cornish's weight "constitutes an extraordinary and compelling reason for release."

ECF 212 at 1.  Cornish emphasizes that "his co-defendants were major operators in the Sinaloa Cartel and coordinated drug trafficking in and out of the Baltimore area," and were discovered to have secreted $2.4 million in cash in their home.  *Id.* at 2–3.

Moreover, Cornish asserts that it is not appropriate to compare his sentence to the sentences imposed on Stanley Rodgers and Lindell Robinson, because they "were not part of Cornish's case, and . . . were not convicted of the same crime."  *Id.* at 3.  Nor, according to Cornish, does his criminal history justify the disparity, because it "was already factored into his guideline range of 97-to-121-months."  *Id.* at 4.  Cornish also urges the Court to take account of his "extraordinary rehabilitation": among other things, "[h]e is a mentor to other prisoners and has completed 42 educational programs" while in prison.  *Id.*  Finally, Cornish renews his argument that, as someone with a BMI over 25, "he has an underlying medical condition that puts him at risk of developing severe COVID-19."  *Id.* at 6.

### B.

I begin my inquiry by considering whether Cornish has identified any "extraordinary and compelling reasons" for a reduction in his sentence.

As an initial matter, I reject the government's contention that the Court is constrained to consider only those reasons identified as "extraordinary and compelling" in Application Note 1 to Section 1B1.13 of the Guidelines.  Indeed, for some time now, it has been clearly established law in the Fourth Circuit that "there is no Sentencing Commission policy statement 'applicable' to . . . [defendant-filed] compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction."  *McCoy*, 981 F.3d at

283.[8]  Under *McCoy*, I may "consider any extraordinary and compelling reason for release that a defendant might raise."  *Id.* at 284 (internal quotation marks and citation omitted).

Cornish argues that his obesity or borderline obesity is an "extraordinary and compelling reason" for a reduction in his sentence, because it places him at greater risk of becoming severely ill with COVID-19.  ECF 204 at 12–16; ECF 212 at 5–8.  Cornish's medical records indicate that, as of October 18, 2022, his BMI was 27.2.  *See* ECF 214; ECF 215-1.  It is also relevant that he received two doses of the Moderna COVID-19 vaccine, albeit nearly two years ago.  ECF 209-1 at 65.

In *Brown*, 78 F.4th 122, the Fourth Circuit explained that, "[t]o establish that the risk posed by COVID-19 presents an 'extraordinary and compelling reason' for release, a defendant must allege 'that the risk of contracting COVID-19 in a prison is higher than the risk outside the prison and that [his] preexisting medical condition increases [his] risk of experiencing a serious, or even fatal, case of COVID-19.'"  *Id.* at 128 (quoting *High*, 997 F.3d at 185).  Further, the *Brown* Court explained that, although "this 'inquiry is multifaceted and must account for the totality of the relevant circumstances,' courts within the Fourth Circuit have looked to whether 'an inmate shows both a particularized susceptibility to COVID-19 and a particularized risk of contracting the disease at his prison facility.'"  *Id.*  (citations and some quotation marks omitted).

Many courts have found that obesity, or even borderline obesity, can serve as a basis for compassionate release, particularly when coupled with other medical conditions.  *See Craig,* 2021

---

[8] It is puzzling and disappointing that the government continues to press upon the Court an incorrect view of existing law.  Although the government acknowledges in a footnote "that *McCoy* is binding precedent . . . and . . . concedes that this Court is bound to apply it," ECF 209 at 12 n.6, it otherwise proceeds as if Application Note 1 applies to the Court's inquiry into the existence of "extraordinary and compelling reasons."  *See, e.g., id.* at 15 (asserting that Cornish's supposed failure to "meet the criteria set forth in U.S.S.G § 1B1.13 . . . should end the matter.").

WL 1541665, at *9 (finding that BMI near 30 provided "extraordinary and compelling reason"); *United States v. Readus*, No. 16-20827-1, 2020 WL 2572280, at *3 (E.D. Mich. May 21, 2020) ("Courts have found that the combination of prediabetes and obesity have been sufficient to warrant release"); *United States v. Smith*, 538 F. Supp. 3d 990, 995 (E.D. Cal. 2021) ("Many courts have also found that people who have a body mass index within the ranges defined as 'overweight' or 'obese' are at greater risk of severe COVID-19."); *Williams*, 2020 WL 3073320, at *1 (finding defendant with a BMI of 32.5 was obese and qualified for compassionate release); *United States v. Hilow*, No. 15-170-JD, 2020 WL 2851086, at *4 (D. N.H. June 2, 2020) (involving asthma, migraines, hypertension, high cholesterol, prediabetes, and borderline obesity); *United States v. Zuckerman*, 451 F. Supp. 3d 329, 335 (S.D.N.Y. 2020) (finding defendant's age, diabetes, hypertension, and obesity provided an extraordinary and compelling reason); *United States v. Ullings*, 1:10-CR-00406, 2020 WL 2394096, at *4 (N.D. Ga. May 12, 2020) (finding defendant's age, hypertension, and obesity provided an extraordinary and compelling reason); *United States v. Foreman*, 3:19-CR-62 (VAB), 2020 WL 2315908, at *4 (D. Conn. May 11, 2020) (finding defendant's age, hypertension, and obesity provided an extraordinary and compelling reason); *United States v. Quintero*, 08-CR-6007L, 2020 WL 2175171, at *1 (W.D.N.Y. May 6, 2020) (finding defendant's diabetes, compromised immune system, obesity, and hypertension provided an extraordinary and compelling reason); *United States v. Dawson*, No. 18-40085, 2020 WL 1812270, at *7 (D. Kan. Apr. 9, 2020) (granting compassionate release based on a defendant's obesity).

Although Cornish is merely "overweight," rather than "obese," he remains to some extent more vulnerable to severe COVID-19 than a person who is not overweight.  *See People with Certain Medical Conditions*, *supra*, https://bit.ly/38S4NfY.  And, although Cornish has been

vaccinated, that "fact . . . does not eliminate concerns about . . . underlying health conditions that might otherwise render him eligible for compassionate release."  *United States v. Drummond*, ELH-19-286, 2023 WL 3645537, at (D. Md. May 24, 2023).

However, unlike the petitioner in nearly every case cited above, Cornish has not identified or provided evidence of any special vulnerabilities, other than his weight.  Indeed, the information provided to the Court suggests that, except for his status as "overweight," Cornish is generally healthy.  It is also significant that, as of October 18, 2023, there were only two "open cases" of COVID-19 at FCI Cumberland, which houses about 900 inmates.  *See Inmate COVID-19 Data*, *supra*, https://perma.cc/J89G-9A2Q.  Moreover, inmates at FCI Cumberland are required to wear face coverings "at all times in all indoor environments (surgical mask in patient care areas)," and "are tested for SARS-CoV-2 when they are symptomatic, asymptomatic but exposed, during movements, and when surveillance is needed."  *See FCI Cumberland*, FEDERAL BUREAU OF PRISONS, https://perma.cc/5WXT-FHG7 (last accessed Oct. 16, 2023) (stating that FCI Cumberland maintains "Level 1 Operations"); *COVID-19 Modified Operations Plan & Matrix*, FEDERAL BUREAU OF PRISONS, https://perma.cc/98EV-M8EV (last accessed Oct. 16, 2023) (describing "Level 1 Operations" and "General Modifications").

In sum, Cornish is marginally overweight but otherwise free of comorbidities.  The threat of COVID-19 remains real at FCI Cumberland, but it is apparently controlled with the use of face masks and surveillance testing.  Even if I were to conclude that Cornish's status as marginally overweight created "a particularized susceptibility to COVID-19," I am satisfied that, in view of the low case incidence at, and precautions taken by, FCI Cumberland, he has not demonstrated "a particularized risk of contracting the disease at his prison facility."  *See Brown*, 78 F.4th at 128.

Cornish also argues that a disparity between his sentence and the sentences of his allegedly more culpable codefendants provides an "extraordinary and compelling" reason for relief. *See* ECF 204 at 9–12; ECF 212 at 1–4. In addition, Cornish suggests that the sentence to which he agreed was based on circumstances that no longer exist.

At the relevant time, if the government pursued the sentencing enhancement, Cornish could have faced a minimum sentence of twenty years for one prior qualifying offense or life in prison for two qualifying prior offenses. But, "[t]oday, . . . an enhancement under 21 U.S.C. § 851 only increases the mandatory minimum to 15 years for one prior offense (down from 20 years [at the time of Cornish's plea]), and to 25 years for additional offenses (down from life)." ECF 204 at 10 n.3.

As noted, in *McCoy*, 981 F.3d 271, the Fourth Circuit recognized that "the dramatic degree to which [a defendant's sentence] exceed[s] what Congress now deems appropriate" can provide an extraordinary and compelling reason for a reduction in sentence. *Id.* at 288. The defendants in the cases consolidated for appeal in *McCoy* were convicted of robberies and firearms violations under 18 U.S.C. § 924(c). *Id.* at 274. At the time of their convictions, under the practice known as "stacking," "a conviction [under § 924(c)] was treated as 'second or subsequent,' triggering [a] 25-year minimum sentence, even if the first § 924(c) conviction was obtained in the same case." *Id.* at 275. After the enactment of the First Step Act, however, "the 25-year mandatory minimum applie[d] only when a prior § 924(c) conviction ar[ose] from a separate case and already . . . bec[a]me final." *Id.* (citation and internal quotation marks omitted). The district courts in *McCoy* granted sentence reductions in part on the basis that, under current law, the defendants would have received sentences significantly less severe than their "stacked" sentences. *Id.* at 274–75. The Fourth Circuit affirmed, holding that "courts legitimately may consider, under the 'extraordinary

and compelling reasons' inquiry, that defendants are serving sentences that Congress itself views as dramatically longer than necessary or fair." *Id.* at 285–86.

Interpreting and quoting *McCoy*, 981 F.3d at 285–86, Judge Blake of this Court explained in *United States v. Myers*, CCB-01-188, 2021 WL 2401237, at *3 (D. Md. June 11, 2021), that a court evaluating a motion for sentence reduction based on a sentencing disparity should consider:

> (1) whether the sentence imposed is grossly disproportionate to a sentence the defendant would likely receive if sentenced today, signifying that the sentence is 'dramatically longer than necessary or fair;' (2) whether the sentence imposed is unusually or grossly lengthy in comparison to sentences currently imposed for similar or more serious offenses; (3) the length of the sentence the defendant already has served; and (4) other personal characteristics of the defendant, which may include the defendant's relative youth at the time of the offense and their post-sentencing conduct in the BOP."

Most recently, in *Brown*, 78 F.4th 122, the Fourth Circuit reaffirmed that a defendant's disparate sentence "is relevant to both the 'extraordinary and compelling reasons' inquiry and the § 3553(a) factors." *Id.* at 130.  Indeed, the Court held that the district court erred by failing to consider a defendant's disparate sentence in its compassionate release analysis. *Id.* at 130–31.  In the Court's view, two features of the sentence it was reviewing provided extraordinary and compelling reasons for relief: the sentence's "sheer and unusual length" in relation to sentences for more serious and violent crimes, and "the gross disparity between" the sentence "and the sentences Congress now believes to be an appropriate penalty for the defendants' conduct." *Id.* at 131.

In light of *McCoy* and *Brown*, I am persuaded that the change in the sentencing structure provides an "extraordinary and compelling reason" for relief.  As Cornish observes, he was exposed at the time of his plea to potential sentences of at least 20 years or life imprisonment if the government had sought an enhancement.  Currently, however, Cornish's exposure would be 15 years or 25 years.  ECF 52 at 9, 10 n.3; *see* First Step Act of 2018, 132 Stat. 5194, 5220.  The

exposure that Cornish faced at the time was undoubtedly a factor in his decision to accept a C plea that substantially exceeded the top end of his Guidelines range.

Indeed, had Cornish not been exposed to life imprisonment, his bargaining position would have been significantly stronger, and there is little reason to think that he would have been willing to agree to a sentence that substantially exceeded the top end of the Guidelines range. Therefore, I am satisfied that the "gross disparity between" Cornish's actual sentence and the sentence he might have agreed to under current law provides an extraordinary and compelling reason for a sentence reduction. *Brown*, 78 F.4th at 131.

In contrast, I am not persuaded that the disparity between Cornish's sentence and the sentences of his codefendants provides an "extraordinary and compelling reason" for relief. To be sure, Cornish's codefendants "appear to have had a greater role in planning and effecting the . . . international drug conspiracy" to which Cornish was a party. ECF 204 at 9. Nonetheless, the sentence imposed on an individual defendant must be considered in reference to facts and circumstances specific to the particular defendant. Many personal factors, such as health conditions, are not necessarily made public.

In this case, there are important differences in the status of the codefendants that warranted the lesser sentences they received. Among other things, none of Cornish's codefendants had a significant criminal history, much less one as troubling as that of Cornish. ECF 209 at 19. As noted, the instant offense was Cornish's fourth federal felony. ECF 56, ¶¶ 32, 34–35. In my view, this and other relevant distinctions mean that Cornish's sentence is not "unusually or grossly lengthy in comparison to sentences . . . imposed for similar or more serious offenses." *Myers*, 2021 WL 2401237, at *3.

**C.**

My conclusion that Cornish has identified "extraordinary and compelling reasons" for relief does not end the inquiry, because I must consider whether the sentencing factors under 18 U.S.C. § 3553(a) also warrant a sentence reduction. *See Brown*, 78 F.4th at 128. For the reasons that follow, I conclude that, under the sentencing factors enumerated in § 3553(a), it is appropriate to reduce Cornish's sentence to 130 months of imprisonment.[9]

Cornish has submitted many letters from friends and family attesting to, among other things, his compassion, generosity, work ethic, religious faith, commitment to abiding by the law, and contributions to prison life. *See, e.g.,* ECF 204-9 at 2 ("Mr. Cornish is an exceptional and inspirational person, who always treats his fellow inmates with respect and dignity."); ECF 204-28 at 2 ("Cornish is a wonderful Husband, father and great grandfather."); ECF 204-34 at 2 ("My dad was a mentor when he was out. . . . He would . . . keep an empty water bottle in his car and fill it with coins and change and . . . give it to homeless people he came across."). In addition, Cornish has "built an exemplary institutional record," *Myers*, 2021 WL 2401237, at *4, having completed 42 prison education courses and earned the trust of the correctional staff in his work as an orderly.[10] *See* ECF 204-7; 204-8. Therefore, there is good basis for finding that Cornish's "history and characteristics" favor a sentence reduction. *See* 18 U.S.C. § 3553(a)(1).

However, any evaluation of Cornish's "history and characteristics" would be incomplete without also accounting for the gravity of the offense, involving a huge quantity of drugs, and

---

[9] As noted, I may a grant a sentence reduction without ordering immediate release. *See* 18 U.S.C. § 3582(c)(1)(A).

[10] The government acknowledges that Cornish does not have a prison disciplinary record. *See* ECF 209 at 7 ("Cornish has no disciplinary record, which is laudable; but he is simply following BOP rules, as he should.").

defendant's considerable and disturbing criminal history.  In particular, the offense for which Cornish is currently incarcerated is his fifth serious drug-related crime and his fourth federal felony offense.  *See* ECF 56, ¶¶ 32–36.  It is also inaccurate to suggest, as the defense asserts, that the Guidelines took the defendant's prior record into account.  Only one prior offense scored points, because of the age of the offenses.  But, this does not render the prior offenses irrelevant. Moreover, it is notable that even the fifteen-year sentence imposed by Judge Motz was not sufficient to deter the defendant from further drug trafficking.

In short, it is understandable that the government did not view this as a case for which the advisory Guidelines range is appropriate.

Nonetheless, "'the risk of recidivism is inversely related to an inmate's age,'" and Cornish is now nearly 60 years old.  *Brown*, 78 F.4th at 133 (quoting *United States v. Howard*, 773 F.3d 519, 553 (4th Cir. 2014)).  The Court is satisfied that a sentence nine months greater than the upper end of the Guidelines range appropriately balances defendant's substantial history of recidivism with defendant's exemplary institutional record and the good qualities described by his supporters.

A sentence of 130 months' imprisonment "provide[s] just punishment for the offense," because it exceeds the ten-year minimum penalty mandated under 21 U.S.C. § 841(b).  Reducing Cornish's sentence to 130 months will also serve the Court's interests in "promot[ing] respect for the law," 18 U.S.C. § 3553(a)(2)(A), "afford[ing] adequate deterrence to criminal conduct," *id.* § 3553(a)(2)(B), and "protect[ing] the public from further crimes of the defendant."  *Id.* § 3553(a)(2)(C).

The Court's interest in "protect[ing] the public from further crimes of the defendant" does not preclude reducing Cornish's sentence.  Although Cornish has a history of recidivism, he and

his supporters have provided the Court with good reason to think that he is, at last, prepared to contribute to the community in a lawful and productive manner.

Finally, in reducing the sentence, I am mindful that, as the Fourth Circuit noted in *Brown*, 78 F.4th at 132, pandemic-related modifications to prison life have made incarceration "harsher and more punitive than [it] would otherwise" be.  (Citation and internal quotation marks omitted).

## V. Conclusion

For the foregoing reasons, I shall grant Cornish's Motion in part and reduce his sentence to 130 months of imprisonment.

An Order follows, consistent with this Memorandum Opinion.

Date: October 19, 2023                                    _____/s/_____
                                                         Ellen L. Hollander
                                                         United States District Judge